**EXHIBIT 2**

1  ROB BONTA
   Attorney General of California
2  MARK R BECKINGTON
   Supervising Deputy Attorney General
3  JANE E. REILLEY
   Deputy Attorney General
4  State Bar No. 314766
   CHRISTINA R.B. LÓPEZ
5  Deputy Attorney General
   State Bar No. 312610
6   300 South Spring Street, Suite 1702
    Los Angeles, CA  90013-1230
7   Telephone:  (213) 269-6106
    Fax:  (916) 324-8835
8   E-mail:  Christina.Lopez@doj.ca.gov
   *Attorneys for Defendant Rob Bonta*
9

10                IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
11

|  |  |
|---|---|
| 12  CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; THE SECOND AMENDMENT FOUNDATION; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION; GUN OWNERS OF CALIFORNIA, INC.; ERICK VELASQUEZ, an individual; CHARLES MESSEL, an individual; BRIAN WEIMER, an individual; CLARENCE RIGALI, an individual; KEITH REEVES, an individual; CYNTHIA GABALDON, an individual; and STEPHEN HOOVER, an individual, | 2:23-cv-10169 **DECLARATION OF PROFESSOR MICHAEL VORENBERG IN SUPPORT OF DEFENDANT ROB BONTA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** Date:      March 13, 2024 Time:      1:30 p.m. Courtroom: 5C Judge:     The Honorable Sherilyn Peace Garnett |

13
14
15
16
17
18
19
20                              Plaintiffs,

21             v.

22  LOS ANGELES COUNTY SHERIFF'S
23  DEPARTMENT; SHERIFF ROBERT
    LUNA, in his official capacity; LA
24  VERNE POLICE DEPARTMENT; LA
    VERNE CHIEF OF POLICE
25  COLLEEN FLORES, in her official
    capacity; ROBERT BONTA, in his
26  official capacity as Attorney General of
    the State of California; and DOES 1-10,
27
                              Defendants.
28

1

**DECLARATION OF PROFESSOR MICHAEL VORENBERG**

2      I, Dr. Michael Vorenberg, declare under penalty of perjury that the following is

3  true and correct:

4      1.      I have been retained by the Office of the Attorney General of the State

5  of California to provide expert opinions and testimony in the above-entitled matter

6  regarding the history and tradition of laws relating to regulations concerning

7  firearms during the nineteenth-century United Sates and especially during the

8  period of the U.S. Civil War and Reconstruction. I have been asked in particular

9  about two matters: 1) whether civilians (non-police and non-military) seeking to

10  carry firearms were required to obtain permission to do so; and 2) whether, if

11  permission to carry firearms was granted in one jurisdiction, the permission was

12  valid in other jurisdictions.  This expert declaration is based on my own personal

13  knowledge and experience, and, if I am called as a witness, I could and would

14  testify competently to the truth of the matters discussed in this declaration.

15

**PROFESSIONAL BACKGROUND AND QUALIFICATIONS**

16      2.      I am an Associate Professor of history at Brown University.  I received

17  my A.B. from Harvard University in 1986, and my Ph.D. in history from Harvard

18  in 1995.  After receiving my Ph.D., I began a postdoctoral fellowship at the W.E.B.

19  Du Bois Institute at Harvard, and then served as an Assistant Professor of History at

20  the State University of New York at Buffalo.  I joined the faculty at Brown

21  University in 1999, and have taught history there ever since.

22      3.      I have concentrated my research on the history of the U.S. Civil War

23  and Reconstruction.  My first book, *Final Freedom: The Civil War, the Abolition of*

24  *Slavery, and the Thirteenth Amendment*, was published by Cambridge University

25  Press in 2001.  The book was a Finalist for the Gilder Lehrman Lincoln Prize.  I am

26  also the author of *The Emancipation Proclamation: A Brief History with*

27  *Documents*, published by Bedford/St. Martin's in 2010.  I am the author of a

28  number of articles and essays on Reconstruction and the law.  These include: "The

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Southern Illinois University Press, 2018); "Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* (Columbia University Press, 2010); "Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions in the History of Postbellum America* (Oxford University Press, 2006); and "Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (Dec. 2005), 416-26.

4.      I have provided expert testimony in *Jane Doe v. Bonta* (Case No. 8:23-cv-01324) and *Koppel v. Bonta* (Case No. 8:23-cv-00813), lawsuits in the Central District of California challenging California's previous "good moral character" licensing requirement; *Rhode v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:18-cv-00802-BEN-JLB) challenging "background checks" for firearms; *Miller v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB) and *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE), both challenging California's regulations of assault weapons; *Wiese v. Bonta*, a lawsuit in the Eastern District of California (Case No. 2:17-cv-00903-WBS-KJN) and *Duncan v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:17-cv-01017-BEN-JLB), both challenging California's regulations of large-capacity magazines; *Ocean State Tactical LLC v. Rhode Island*, a lawsuit in the District of Rhode Island (Case No. 1:22-cv-246-JJM-PAS) challenging that state's regulation of large-capacity magazines; *Oregon Firearms Federation, Inc. v. Brown*, a lawsuit in the District of Oregon (Case No. 2:22-cv-01815-IM) challenging that state's regulation of large-capacity magazines; *National Association for Gun Rights v. City of Naperville, Ill.*, a lawsuit in the Northern District of Illinois (Case No. 1:22-cv-04775) challenging

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

the state of Illinois' and the City of Naperville's regulation of assault weapons; and *National Association of Gun Rights v. Campbell*, a lawsuit in the District of Massachusetts (Case No. 1:22-cv-11431) challenging the state of Massachusetts' regulation of assault weapons and large-capacity magazines.

5.     A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

## RETENTION AND COMPENSATION

6.     I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $250 per hour. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

## SUMMARY OF OPINIONS

7.     This declaration provides results of an investigation into qualifications imposed by federal, state, and local governments on the ability of individuals to acquire, possess, and carry firearms and ammunition during the Reconstruction period of U.S. History, with a special focus on the period during Reconstruction when the Fourteenth Amendment to the U.S. Constitution was created, ratified, and enforced (1863-1883).  I begin by explaining why, historically, the era of the Fourteenth Amendment is a highly relevant period for any consideration of the tradition of firearm regulation.  Next, I explain the significance of local laws, such as town and city ordinances, to any understanding of the history and tradition of firearms law in the era of the Fourteenth Amendment. Local laws regulating firearms were part of longstanding police powers, specifically the part of police powers assuring public safety and "public peace" to communities.  (Through the nineteenth century, "keeping the peace" or upholding the "public peace" were common expressions to describe the maintenance of public safety.)  I describe the longstanding understanding among historians that the regulation of the "peace" in the middle decades of the nineteenth century relied at least as much on local

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

legislation and law enforcement as it did on state and national legislation and law enforcement. I then describe and analyze local laws from this period that concerned the carrying of firearms.

8.    The report concludes that local laws of the era reflected a public understanding that the carrying of firearms could be regulated by local authorities. In local regulations relating to the carrying of firearms, it was common to require ordinary civilians to provide affirmative proof that they were suitable to carry weapons. Furthermore, the regulations in question were always specific to locales. As was typical with police power regulations of the era, especially those regulations concerning "keeping the peace," authorities of a locale had exclusive determination as to whether the standards for permission to carry weapons had been met by those seeking permission.  Local authorities were under no obligation to respect permission that had been granted to would-be firearms-carriers in other jurisdictions.

## TERMINOLOGY, METHODOLOGY, AND RESEARCH MATERIALS

9.    In preparing this declaration, I have researched legal matters from the founding era of the United States (the era surrounding the ratification of the Constitution in 1789 and the Bill of Rights in 1791) through the era of Reconstruction.  Most of my attention has been to the era of the Fourteenth Amendment, as this period is my specialty and, with regard to firearms law, the era has not been scrutinized with the rigor that scholars have applied to the founding period.

10.    The "era of the Fourteenth Amendment" is here defined as the period roughly from 1863 to 1883.  1863 was the year of the Emancipation Proclamation, which made it near-certain that a new social, political, and legal order would result from the Civil War that began in 1861.  From that point on, discussions of equal rights and privileges became common across all sections of the nation.  With the surrender of the major Confederate armies in 1865, the defining and securing of

5

equal rights and privileges became more pressing than ever—a central aim of
Reconstruction.  The Fourteenth Amendment, which contains the language that
today remains at the core of ideas about equal rights and privileges, including the
innovative notion that the 1791 Bill of Rights might be applied to the states, was
passed by Congress in 1866, ratified in 1868, and enforced by a series of measures
enacted during the 1870s.  In the 1870s, the U.S. Supreme Court began to issue
decisions that curtailed the impact of the Fourteenth Amendment, especially its
potential for delivering broad civil rights to all Americans.  The capstone decision
of this nature came in 1883 with the *Civil Rights Cases*, so I take 1883 as a
constitutional endpoint of the era of the Fourteenth Amendment.

11.     My research has included an examination of recent scholarship on
firearms and firearms laws in the period under examination.  Some of this work has
been produced by scholars trained as historians, such as myself; some has been
produced by scholars trained primarily as lawyers.  The professional background of
the scholars in question has had no influence on my regard for their work.  Rather,
my assessment of the quality and relevance of the work has depended on whether it
used historical sources and historical methods in the ways familiar to academic
historians.

12.     Much of my research was on the historical sources themselves.
These included the standard legal sources of published federal and state statutes as
well as published federal and state judicial reports.

13.     I also examined local municipal ordinances from the era.  As I will
describe in fuller detail below in the "Findings" section, local firearms ordinances
were as important as state and federal laws in establishing the rights and regulations
surrounding firearms.  Unfortunately, local ordinances were only occasionally
published, and in those instances, usually as parts of printed collections of state
laws.  Many local ordinances remained unpublished and even unprinted, existing in
handwritten books in the offices of local magistrates.  Only recently have

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

1  systematic efforts been made to recover and digitize local ordinances.  Some of the

2  most commonly used databases for firearms research, such as guncite.com, do not

3  include local ordinances but only state and federal laws.  An exception among such

4  databases is the "Repository of Historical Gun Laws" hosted by the Duke Center

5  for Firearms Law (https://firearmslaw.duke.edu/repository-of-historical-gun-laws).

6  In the last few years, the managers of this database have added scores of municipal-

7  level laws concerning firearms.  As useful as Duke's "Repository of Historical

8  Laws" was for my research into local ordinances, the database is far from

9  comprehensive.  Because the project to uncover municipal ordinances relating to

10  firearms started only recently, only a fraction of the ordinances that likely existed in

11  the period under review are represented in the database.  However, I searched three

12  separate databases of nineteenth-century U.S. newspapers and found dozens of

13  firearms-related local ordinances that have not yet been recorded by the Duke

14  database or any other database known to me.  Sometimes the full text of an

15  ordinance was published in a newspaper; sometimes only relevant excerpts were

16  published; sometimes the content of the ordinance was summarized or implied.

17  The three databases of newspapers consulted were "Chronicling America" (hosted

18  by the Library of Congress), "Nineteenth Century Newspapers" (hosted by Gale

19  Publishing), and "ProQuest Historical Newspapers" (hosted by ProQuest).  My

20  search through newspapers was not comprehensive—it excluded newspapers that

21  have not been digitized and made searchable—and thus, like the Duke database, my

22  evidence from newspapers should be treated as only a fraction of what likely

23  existed in terms of firearms regulations at the municipal level.

24      14.    For original published material not available through the databases

25  already mentioned, I relied mostly on HathiTrust digital library and Hein Online.

26

27

28

7

**FINDINGS**

**A. The Era of the Fourteenth Amendment**

15.     Research into the scholarship on the era of the Fourteenth Amendment reveals that the era is crucial for any consideration of the history and tradition of firearms regulation.  The assessment by historians of the era is unequivocal: the period was a watershed moment, though not quite a revolution, for rights and regulation in general and for firearms rights and regulations in particular.[1]  Americans were more likely than ever before to welcome legal innovations and not be constrained by laws and legal meanings of the founding generation. When it came to "the work of the fathers" of the founding era, one anonymous writer of the Reconstruction era opined, it "was done to little purpose if it has not made the children wiser than they. . . . *The Constitution was made so well that we can make it better*."[2]  Seeing as the very term "civil rights" did not exist prior to the Reconstruction era, it is difficult to avoid the conclusion that the public meaning of firearms rights and regulations during the era of the Fourteenth Amendment is at least as relevant as the founding period for understanding the history and tradition of firearms law.[3]

16.     During the Civil War and Reconstruction, as the constitutional order

---

[1] Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* (New York: W. W. Norton, 2019), offers a general assessment of how the Reconstruction-era Amendments remade the Constitution in some ways but not in others.  For a historian's balanced assessment of how firearms rights and regulations advanced in some ways but not in others during Reconstruction, see Carole Emberton, "The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South," *Stanford Law and Policy Review*, 17 (2006), 611-629.

[2] Emphasis in original; Michael Vorenberg, *Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment* (Cambridge: Cambridge University Press, 2001), 191-95 (quotation at 194).

[3] On the origin of the term "civil rights" during Reconstruction—as opposed to the concept of civil rights, which predated the Amendment—see Christopher W. Schmidt, "The Fourteenth Amendment and the Transformation of Civil Rights," *Journal of the Civil War Era*, 10 (March 2020), 81-104. Also see Kate Masur, *Until Justice Be Done: America's First Civil Rights Movement, from the Revolution to Reconstruction* (New York: W. W. Norton, 2021), 314-330.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

changed, much about firearms and firearms law changed as well. The war led to greater firearms production and distribution.[4] Reconstruction-era imperatives of legal equality for Blacks led to the elimination of race-based restrictions for arms and the imposition of restrictions on Whites deemed disloyal to the United States.[5] Gun-bearing militias increased in number during the Reconstruction-era South as a means of maintaining postwar peace and preventing further insurrection. To ensure that these militias served the interests of the United States and not those of insurrectionists, former Confederates were often banned from the organizations and African Americans, who previously had been denied membership in southern state militias, were encouraged to join.[6] Meanwhile, in many northern cities during the Reconstruction era, professional police forces, some of them granted rights to carry firearms, came into existence.[7] All of these developments necessarily came with

[4] Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016), 65-74; on the distribution of arms by the U.S. Army during and after the Civil War, see General Orders, No. 101, May 30, 1865, *The War of the Rebellion* (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43; 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172.

[5] Nicholas J. Johnson, David B. Kopel, George A. Mocsary, E. Gregory Wallace, and Donald Kilmer, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3rd ed., New York: Wolters Kluwer, 2022), 455-477; Stephen P. Halbrook, *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*, 2nd ed. (Oakland, Cal.: The Independent Institute, 2021). In areas in the South under U.S. occupation during Reconstruction, military and civilian authorities regularly banned or regulated disloyal people's access to firearms. In New Orleans, for example, firearms were confiscated from pro-Confederates in 1862 and then a permitting scheme for possession by loyal Unionists was imposed in 1864. See Chester G. Hearn, *When the Devil Came Down to Dixie: Ben Butler in New Orleans* (Baton Rouge: Louisiana State University Press, 1997), 86-87; *New Orleans Crescent*, January 31, 1869, p. 2; permit issued to Edward J. Gay of New Orleans, 1864, https://ingest.louisianadigitallibrary.org/islandora/object/lsu-sc-p15140coll10%3A5730. In St. Louis in 1864, U.S. officers required that all sellers and purchasers of firearms in the city and throughout Northeast Missouri be "loyal citizens" (those who had taken an oath of loyalty to the U.S.); see General Orders, No. 32, Feb. 27, 1864, *The War of the Rebellion* (Washington, D.C.: Government Printing Office, 1880-1901), ser. 1, vol. 34, p. 434; and General Orders, No. 142, Aug. 8, 1864, ibid., ser. 1, vol. 41, pt. 2, p. 605.

[6] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 175-178.

[7] Eric H. Monkkonen, *Police in Urban America*, 1860-1920 (Cambridge:

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

changes in the laws regarding the carrying of firearms.

### B. Persistence and Innovation in "Firearms Localism"

17.    The impact of developments in firearms, firearms proliferation, and institutions involving firearms, like militias and police forces, was detectable in laws adopted during Reconstruction.  The *Bruen* decision noted a number of state-level carry regulations upheld by state courts in the late 1870s and 1880s.  (597 U.S. (2022) 86).  Yet, well before then, local-level laws began restricting the right to carry.

18.    By 1883, in states with no public carry restrictions, a number of municipalities had nonetheless instituted carry restrictions in their local ordinances. These included the California cities of Alameda, Eureka, Napa, Los Angeles, Sacramento, San Francisco, and Santa Barbara[8]; the Colorado city of Georgetown[9]; the Massachusetts city of Boston[10]; the Maryland city of Annapolis[11]; the New

---

Cambridge University Press, 1981), 49-62; John C. Schneider, *Detroit and the Problem of Order, 1830-1880* (Lincoln: University of Nebraska Press, 1980), 117-118; Roger Lane, *Policing the City: Boston, 1822-1885* (Cambridge, Mass.: Harvard University Press, 1967), 187-188

[8] "Concerning Concealed Weapons," *Alameda Encinal*, May 3, 1882, p. 3; *Charter and Revised Ordinances of the City of Eureka* (1905), Penal Ordinances, Ordinance no. 55, "Prohibiting the Carrying of Concealed Weapons," §§ 1-4 (1878); "Concealed Weapons." *The Napa Valley Register*, November 10, 1880, p. 3; "New Advertisements," *Los Angeles Tri-Weekly News*, July 22, 1865, p. 2; R. M. Clarken, ed., *Charter and Ordinances of the City of Sacramento Together with Statutes as Are Especially Important and an Appendix of City Officers from 1849 to 1897, Inclusive* (1896), Ordinance no. 84, "Prohibiting the Carrying of Concealed Deadly Weapons" (1876); *San Francisco Municipal Reports* (1875), Genl. Orders, Order No. 1,226, "Prohibiting the Carrying of Concealed Deadly Weapons," § 1 (1875) (San Francisco had had an anti-carry municipal ordinance since 1849; see 1849 Cal. Stat. 245, div. 11, § 127); *Charter and Ordinances and Rules of the Council, City of Santa Barbara, State of California*, 354 (1890) (stating and repealing the ordinance of 1881).

[9] Edward O. Wolcott (Editor), *Ordinances of Georgetown Passed June 7th, A.D. 1877*, 100 (1877), § 9.

[10] "Municipal Court—October 10," *Boston Daily Advertiser*, Oct. 11, 1867, p. 2.

[11] 1872 Md. Laws 57, ch. 42, § 246.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

Jersey city of Jersey City[12]; the New York cities of Brooklyn and New York City[13]; the Ohio city of Massillon[14]; the Oregon city of Astoria[15]; and the Pennsylvania cities of Philadelphia and Scranton.[16]

19.    Also by 1883, in states that *did* have anti-carry state laws, municipalities within those states had adopted anti-carry ordinances prior to the states creating their laws.  Such municipalities included the Arkansas city of Helena[17]; the Georgia city of Savannah[18]; the Illinois cities of Chicago, Hyde Park, and Nashville[19]; the Indiana city of Bedford[20]; the Kansas cities of Abilene, Arkansas City, Beloit, Empire City, and Salina[21]; the Louisiana cities of New

---

[12] *Order of the Board of Aldermen. Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto* 41 (1874), §§ 1–4.

[13] *The Brooklyn Daily Eagle*, Oct. 26, 1880, p. 1; Elliott F. Shepard and Ebenezer B. Shafer, *Ordinances of the Mayor, Aldermen and Commonalty of the City of New York*, 27 (1881), §§ 264-267.  For evidence of the New York City ordinance being in place by 1867, see "Coroner's Inquest, New York, Dec. 13," *Bangor [Maine] Daily Whig and Courier*, Dec. 14, 1867, p. 1.

[14] *Revised Ordinances of the City of Massillon* (1893), 10 (1880), §§ 129-130.

[15] "Ordinance No. 317. An Ordinance Concerning Offenses and Disorderly Conduct," *Daily Astorian*, Feb. 22, 1879.

[16] For Philadelphia, see "Court of Quarter Sessions," Philadelphia *North American and United States Gazette*, March 1, 1866, p. 1, and "Court of Quarter Sessions," ibid., Oct. 3, 1866 (Philadelphia had had an anti-carry ordinance since 1851; see 1851 Pa. Laws 382, no. 239, § 4).  For Scranton, see "New York," *Cleveland Daily Herald*, Nov. 20, 1874, p. 1.

[17] "Judge J. E. Bennett's Charge to the Grand Jury at the May Term of the Phillips County Circuit Court," Little Rock *Morning Republican*, June 26, 1869, p. 1.

[18] "Mayor's Court," Savannah *Daily News and Herald*, May 31, 1866, p. 3.

[19] Murray F. Tuley, *Laws and Ordinances Governing the City of Chicago*, 8 (1871), §§ 1-9; Consider H. Willett, *Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments*, 64 (1876), § 39; "Ordinance No. 29: Concerning the Carrying of Concealed Weapons," *Nashville Journal*, March 26, 1880, p. 4.

[20] "Protecting Public Morality, Order and Safety," *Ordinances of the Town of Bedford*, Ordinance no. 1 (1869).

[21] "An Ordinance Relating to the Carrying of Fire Arms and Other Deadly Weapons," *Abilene Chronicle*, May 12, 1870, p. 1; "By request of the City Marshal....," *Arkansas Valley* Democrat (Arkansas City), Aug. 8, 1879, p. 3; "Ordinance No. 12: An Ordinance to Suppress Criminal and Improper Practices in

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

Orleans and Opelousas[22]; the Minnesota city of Hastings[23]; the Missouri cities of Moberly and St. Louis[24]; the North Carolina city of Charlotte[25]; the Nebraska cities of Falls City, Nebraska City, and Omaha[26]; the Nevada city of Elko[27]; the Tennessee city of Memphis[28]; and the Virginia city of Lexington.[29]

20.    That the innovation in carry laws occurred at the municipal level prior to the state level is unsurprising for two interrelated reasons. First, firearms law in the early United States had always varied between locales, with greater restrictions in urban over rural areas.  The legal scholar Joseph Blocher has termed this variation "Firearm Localism."[30]  As Blocher writes, "cities have traditionally enacted the country's strictest gun control measures, including handgun bans, safe storage requirements, limits on public carrying, and prohibitions on shooting guns within city limits."[31]

21.    Second, because firearms regulations generally fell into the category of

---

the City of Beloit," *Beloit Weekly Democrat*, May 16, 1879, p. 4; "Ordinance No. 1," *The Mining Echo* (Empire City), July 7, 1877, p. 1; *Revised Ordinances of the City of Salina . . .*  (1879), p. 99.

[22] "City Intelligence," *New-Orleans Commercial Bulletin*, Feb. 8, 1868, p. 1; "Proceedings of  the Board of Police of the Town of Opelousas," *Opelousas Journal*, June 26, 1874, p. 3

[23] *City Charter of the City of Hastings*, 74 (1870), § 3.

[24] "An Act to Incorporate The Town Of Moberly," 3 Mo. Laws (1873), § 1, pt. 15; Everett W. Pattinson, *Revised Ordinance of the City of St. Louis* 491 (1871), art. 2, § 9.

[25] *Private Laws of the State of North Carolina* 7 (1866), § 19.

[26] "Ordinance No. 51: An Ordinance to Establish a Criminal Code," [Falls City, Neb.] *Globe-Journal*, June 5, 1880, p. 2; Gilbert B. Scolfield (Editor), *Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska* 36 (1872), No. 7, § 1; W. J. Connell, *The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together With the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska* 344–45 (1890), § 10.

[27] "Elko as Seen by a German Traveler," *Elko Independent*, May 21, 1870, p. 1.

[28] William H. Bridges (Editor), *Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix* 190 (1863), art. 3, § 3.

[29] *The Charter and General Ordinances of the Town of Lexington, Virginia* (1892), 87 (reprinting 1867 ordinance).

[30] Joseph Blocher, "Firearm Localism," *Yale Law Journal*, 123 (2013), 82-146.

[31] Blocher, "Firearms Localism," 87.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

police powers, and police powers until the latter decades of the nineteenth century
traditionally were under the control of local rather than state governments, it is no
surprise that firearms restrictions were instituted at the local level prior to being
enacted by state law.[32]  By the era of Reconstruction, state statutes, regardless of
the fields of law they covered, were far less robust than they would become in mid-
twentieth century.  Between 1832 and 1900, almost all of the state legislatures went
from meeting annually to biennially.[33]  The most likely reason for the shift was that,
in the words of one scholar, "it was reasoned that biennial sessions produced fewer
new laws, thereby fostering economic stability while also reducing costs associated
with operating the legislature."[34]  State governments thus created fewer laws, and
what laws that they did create concerned mostly matters of property.  In criminal
misdemeanors, which included offenses involving the carrying of firearms, state
statutes tended to say less than local ordinances or tended to lag behind
developments in local law.  Through most of the nineteenth century, the historian
Laura Edwards explains, state lawmakers, "with their attention firmly fixed on
property law . . . left governance over most acts of violence to local jurisdictions . . .
.  State law did address more serious offenses, such as murder, manslaughter, rape,
and maiming.  But misdemeanor violence did not figure in revised codes or appear
as a topic of legislation until the late nineteenth century. . . .  When state law made
forays into criminal violence, it was usually one step behind local jurisdictions."[35]

      22.    A few further points about local police-power legislation are relevant
to the case at hand.  First, police-power laws aimed specifically at "keeping the

---

[32] On nineteenth-century police powers, especially municipal ordinances, see
William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-
Century America* (Chapel Hill: University of North Carolina Press, 1996).

[33] Peverill Squire, *The Evolution of American Legislatures: Colonies,
Territories, and States, 1619-2009* (Ann Arbor: University of Michigan Press,
2012), 243-248.

[34] Peverill Squire, "American State Legislatures in Historical Perspective,"
*PS: Political Science and Politics*, 52 (July 2019), 418-420.

[35] Laura Edwards, *The People and Their Peace: Legal Culture and the
Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill:
University of North Carolina Press, 2009), 229.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

peace," including ordinances regulating the carrying of firearms, were understood to embody rather than deny rights.  Modern absolutist libertarian assumptions that rights necessarily require the absence of regulations are not grounded in the reality of U.S. history from the founding period through the era of the Fourteenth Amendment.  Especially in police-powers legislation, rights and regulations were understood to exist in symbiosis.  The legal writer Thomas Cooper in 1826 explained:

> Government is not merely a thing of theory, and of abstract right.  It is founded on public expedience, guided by past experience.  We are not required to shut our eyes to notorious facts. The great object of all laws is the general welfare—public utility.  There can be no rights inconsistent with this.  If a right may be safely exercised under some circumstances and not under others, it ought not to be allowed in the latter cases.  If we know that a lunatic, or a man given to habitual intoxication, cannot be safely trusted with the management of his property, we appoint guardians and trustees for this purpose.  If a man cannot be safely trusted with liquor or with arms, he has no right to them.[36]

23.    As stated above, notions of rights, especially civil rights, became more concrete during the era of Reconstruction.  But this does not mean that there was a disappearance of old notions that some rights, specifically those related to peace-keeping and other police powers, required regulation.  The persistence of this understanding of the symbiosis between rights and regulations of peace-keeping at the local level explains why municipal firearms-carry ordinances were rarely, if ever, challenged—and managed to survive the few legal challenges that were brought against them—before, during, and even after the era of the Fourteenth Amendment.[37]

24.    Another relevant aspect of police powers as expressed in municipal ordinances is that they were non-reciprocal in nature.  That is, they were designed by and for the local population with local objectives and circumstances in mind.  For this reason, a right or privilege granted to an individual in one locality would

---

[36] Thomas Cooper, "On the Foundation of Civil Government," in Thomas Cooper, *Two Essays* (Columbia, S.C.: D. and J.M. Faust, 1826), 15-16.
[37] Blocher, "Firearms Localism," 144-145.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

have no meaning in another locality.  If one were granted a license by a city to operate a tavern selling liquor, one could hardly expect that license to provide the same privilege in some other city.  At best, the license in question might help qualify the tavern-keeper for a license in a city in the same state.  But it would be of no help to the tavern-keeper seeking a license in a city in some other state.  In the same way, a grant of a privilege to carry firearms in one municipality, such as might be made to a local peace-keeping officer, would have no meaning in some other out-of-state municipality, as peace-keeping officers were considered specific either to their city or to their state.[38]

25.    One final general note about nineteenth-century police powers: they did not cover marriage.  Weddings might be performed by local courts or officers, but the regulations followed by these officials, and the laws under which marriages were regulated, were state-based, not locale-based.  On a practical level, this matter conformed to the nature of life at the time.  Married people often moved, and getting married with every move would be impractical, even proving a disincentive to marriage.  On a legal level, marriage fell under property contract law, not under police powers of public safety, nuisance, public morals, and the like.[39]  If a person in a particular marriage behaved immorally, perhaps by committing adultery or beating a spouse, then and only then police powers came into play: the local police might intervene, perhaps punishing the offending party or separating the spouses.[40]  Meanwhile, general laws regulating marriage, such as laws prohibiting certain types of marriage (e.g. marriage between people of different races or of different nationalities), were adopted at the state level.  As a result, reciprocity between

---

[38] Novak, *The People's Welfare*, 10 ("nineteenth-century American governance remained decidedly local. . . .  [W]ithin communities, individuals were expected to conform their behavior to local rules and expectations").

[39] Novak, *The People's Welfare*, 320-21, note 125.

[40] Laura F. Edwards, "Law, Domestic Violence, and the Limits of Patriarchal Authority in the Antebellum South," *Journal of Southern History*, 65 (Nov. 1999), 733-770.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

jurisdictions in terms of respecting marriage contracts was the norm, certainly within states and usually between states.[41]  No one well-informed in law in the nineteenth century would have analogized the reciprocity involved in marriage law with the (non-existent) reciprocity involved in local firearms regulation.

### C.  The Shift Toward Affirmative Permitting during the Era of the Fourteenth Amendment

26.    Turning now to the substance of local firearms-carry ordinances in the era of the Fourteenth Amendment, we find a proliferation of affirmative permitting—that is, legal procedures whereby civilians wishing to own or carry firearms had to supply relevant information about themselves to authorities in order to qualify for the right in question.  Affirmative permitting is often assumed to be a recent development in U.S. law.  In fact, by the era of the Fourteenth Amendment, affirmative permitting was common, in particular in local law.

27.    I found permitting schemes in southern cities in the late 1860s.  This made sense because: 1) gun violence had always been greater in southern cities than in cities elsewhere in the country; and 2) southern cities were filled with former Confederates who continued to use violence against pro-Union civilians and soldiers, especially African Americans.[42]  U.S. soldiers maintained a presence in a number of southern cities through the 1870s to ensure that policing by local authorities conformed to the U.S. laws and policies of Reconstruction.[43]  A South

---

[41] Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* (Cambridge: Harvard University Press, 2000), 24-55.  On the complex history of marriage regulations concerning race, see Peter Wallenstein, *Tell the Court I Love My Wife: Race, Marriage, and Law—An American History* (New York: St Martin's Press, 2002).

[42] Eric Ruben and Saul Cornell, "Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," *Yale Law Journal Forum*, 125 (2015) 121; Randolph Roth, *American Homicide* (Cambridge: Harvard University Press, 2009); 218-219; Edward L. Ayers, *Vengeance and Justice: Crime and Punishment in the 19th-Century American South* (New York: Oxford University Press, 1984), 73-10.

[43] Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.:

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

Carolina newspaper on August 31, 1867 reported the widespread understanding that no one in areas occupied by U.S. troops had "a right to carry arms in any way, without permission from the military authorities."[44]  The article did not specify what information a would-be gun-carrier needed to supply to the authorities in order to receive permission.  No doubt proof of allegiance to the United States would be required, such as a record of the applicant having taken an oath pledging to be loyal and law-abiding.[45]

28.    At least as often in southern cities in the era of the Fourteenth Amendment, permission to carry firearms could be granted by a civil official.  In Memphis, Tennessee in early 1866, the Mayor issued permits for the carrying of concealed weapons.[46]  In Charlotte, North Carolina that same year (1866), a municipal ordinance was adopted levying a tax on every "pistol" and other "deadly weapon worn upon the person except a pocket knife"; however, anyone receiving "special permission of the board of alderman" was exempted from the tax.[47]  St. Louis, Missouri adopted an ordinance in 1871 allowing the carrying of concealed weapons for those who obtained written permission from the city mayor.[48]  In New

---

Southern Illinois University Press, 2018), 60-88; James E. Sefton, *The United States Army and Reconstruction, 1865-1877* (Baton Rouge: Louisiana State University Press, 1967), 5-106.

[44] *Keowee* [S.C.] *Courier*, August 31, 1867, p. 2.

[45] For an example of an expectation of oath-taking to secure a right to bear arms, see Daniel Sickles, "General Orders, No. 1," Jan. 17, 1866, reprinted in Edward McPherson (ed.), *A Handbook of Politics for 1868* (Washington, DC: Philp and Solomons, 1868), 36-38. In *Bruen*, the Court dismissed the relevance of the Sickles order by claiming it was a wartime order and thus did not "align" with the peacetime Constitution.  597 U.S. (2022) 63 fn. 26.  However, military authorities like Sickles were acting outside of the temporal scope of the war; they were effectively "peace officers" at a time when the regular, local peace officers could not always be trusted because of their possible insurrectionist leanings.  In some locales, such as the capitals of Florida, Louisiana, and South Carolina, U.S. troops served this police function through early 1877, twelve years after the end of the Civil War and nine years after the adoption of the Fourteenth Amendment.  See James E. Sefton, *The United States Army and Reconstruction, 1865-1877* (Baton Rouge: Louisiana State University Press, 1967).

[46] [Memphis] *Public Ledger*, July 17, 1866, p. 3.

[47] *Supra*, fn. 28.

[48] Pattison, *Revised Ordinance of the City of St. Louis*, *supra*, fn. 27.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

1    Orleans at some point soon after the Civil War, the authority to issue concealed

2    carry permits was transferred from U.S. military authorities occupying the city to

3    the city's mayor.[49]  Then, in 1875, Louisiana ended its permitting system by

4    passing a state law banning the carrying of firearms for all civilians.[50]

5        29.     Outside of the South during this period, permitting systems in

6    municipalities eventually became common.  Some of the early cities to issue

7    permits for firearms-carry were in Illinois.  Hyde Park in 1876 allowed firearms

8    carry to those civilians who had "written permission of the Captain of Police."[51]  In

9    1880, Nashville, Illinois prohibited the carrying of weapons except to those who

10    received a written permit, which required an application and fee.[52]  Chicago

11    established a permit system for carry, also in 1880.[53]  Many in the city had been

12    appealing for such a system for years.  In 1876, an editorial writer for the *Chicago*

13    *Tribune* applauded a plea made by a New York City judge for a statewide

14    enactment of a permit system and made a similar appeal to the legislature of

15    Illinois.[54]  The *Tribune* writer's wish did not come true for Illinois but it did for the

16    city of Chicago.  The 1880 permitting law went into effect in February 1880.  An

---

[49] *New Orleans Crescent*, January 31, 1869.

[50] *New Orleans Republican*, October 14, 1875, p. 3 (the article describes how civilians unaware of the new state law continued to no avail to apply for permits). The newspaper article implies that the state law against carrying of firearms had been recently passed. Databases of firearms law typically give the date of the statewide ban not as 1875 but as 1879, but 1879 was simply the year of a new constitution that, among other things, acknowledged the constitutionality of existing laws banning carrying.  1875 as the year of the ban is supported by the 1875 report of the Louisiana Attorney General, who wrote of "the law against carrying dangerous weapons concealed on or about the person." *Annual Report of the Attorney General to the General Assembly of Louisiana, for the Year 1875* (New Orleans: *New Orleans Republican*, 1876), 12.

[51] Willett, *supra*, fn. 22.

[52] *Nashville Journal*, March 26, 1880, *supra*, fn. 22.

[53] Tuley, *supra*, fn. 22.

[54] *Chicago Tribune*, February 2, 1876, p. 4.  The New York City judge in question, Judge Brady, suggested a permitting scheme by which only a "brave man" could carry a firearm.  Only the "brave man" could resist the "disputatious and belligerent spirt" provoked by mere confrontation rather than "real danger," whereas the "timorous man" would have his "apprehensions . . . enhanced by his weakness" and be more likely to use the weapon unnecessarily.  The full opinion of Judge Brady was reprinted in the *New York Herald*, Jan. 29, 1876, p. 8.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

applicant submitted the request to the city police; information required included an address, the applicant's age, and "his" business (it was male specific).  If a permit was issued, it expired in one year.[55]

30.    Although New York state did not have a statewide firearms carry ban during the era of the Fourteenth Amendment, New York City did have a municipal ban on firearms carrying, and the ban allowed permitting by local police commanders.  The text of the ordinance was not printed until 1881, but it was definitely in place by 1867.[56]  Brooklyn, New York adopted an anti-carry ordinance in 1880.[57]  Just west of Brooklyn and New York City, the municipality of Jersey City, New Jersey already had in place an ordinance, originally approved in 1868, that banned the carrying of firearms but allowed exceptions for civilians granted permits by the municipal court.[58]

31.    Cities in the West, most of which were relatively new, were more likely than those in the East to have municipal ordinances requiring permits for concealed carry of firearms.  Ironton, Missouri adopted an ordinance in 1881 requiring permits issued by the mayor to be held by anyone carrying a concealed firearm.[59]  Prior to that year, at least as early as 1879, the Kansas municipalities of Arkansas City and Beloit also allowed civilians to obtain a permit to carry concealed weapons from the mayor.[60]  It is not specified in these municipal ordinances what would entitle a person to a permit.  However, it is reasonable to assume that a civilian would have to make the case that he needed it for traveling between home and business, and that he was an upstanding citizen.  One basis for this assumption lies in the neighboring state of Nebraska.  In 1872, seven years before the cities in Kansas adopted permitting systems for concealed carry, Omaha

---

[55] "Carrying Concealed Weapons," [Chicago] *Daily Inter Ocean*, Nov. 1, 1880, p. 6.
[56] *Supra*, fn 15.
[57] *Supra*, fn. 15.
[58] *Order of the Board of Aldermen*, *supra*, fn. 14.
[59] "Ordinance No. 43," *Iron County Register*, September 22, 1881, p. 5.
[60] *Supra*, fn. 24.

Declaration of Dr. Michael Vorenberg
Case No 2:23-cv-10169

required permission from the mayor to "unnecessarily discharge any fire-arm."  The same ordinance banned concealed carry of firearms for civilians and did not explicitly mention a permit exception, but the ordinance did mention an exception for "well known and worthy citizens, or persons of good repute, who may carry arms for their own protection in going to or from their place or places of business, if such business be lawful."[61]

32.    Further West, in even newer cities, permission systems of some sort were regular features of city life.  A visitor to Elko, Nevada reported in 1870 that "whoever carried weapons without permission of the magistrate was shown out of town."[62]  An 1879 municipal ordinance in Astoria, Oregon, required the "recommendation, in writing, of the chief of police" for an applicant to receive a permit to carry concealed firearms.[63]

33.    Finally, there is California, a state with at least seven cities that had permitting systems prior to 1883: Alameda, Eureka, Napa, Los Angeles, Sacramento, San Francisco, and Santa Barbara.[64]  In some of these cities, permission for the carrying of a concealed weapon had to be granted by the mayor; in others, permission came from the police commissioners.  The permitting system in San Francisco received national attention in 1879 when the mayor-elect of the city reported that he had been attacked by a person who held a "special license" to carry concealed arms.  The mayor-elect called on the police commissioners of the city to revoke the attacker's permit.  In reporting the story, some newspapers reprinted the relevant excerpt of the municipal code: "The police commissioners may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed

---

[61] Connell, *The Revised Ordinances of the City of Omaha*, *supra*, fn 30
[62] *Supra*, fn. 31.
[63] *Daily Astorian*, supra, fn. 17.  The ordinance also required the payment of a fee for the permit.
[64] *Supra*, fn. 10.

deadly weapons for his own protection."[65]

## CONCLUSION

34.    "Any peaceable person."  Such is the characterization of one eligible to receive a permit to carry a concealed deadly weapon in the city of San Francisco in the late 1870s, only ten years after the adoption of the Fourteenth Amendment. The "peaceable person" standard was used in other cities at the time as well, as this report has shown, even though those exact words were not always the ones used. This phrase represents the logical culmination of a consistent principle throughout much of the nineteenth century, and certainly throughout the era of the Fourteenth Amendment: that "keeping the peace" was an integral part of municipal law and law enforcement.  Indeed, when the imperative of "keeping the peace" ran up against an individual right to bear arms, even though that right was enshrined in the Bill of Rights and incorporated against the states in the Fourteenth Amendment, reasonable regulations were permissible to keep "the peace."

35.    Many of the examples of the regulation of firearms that I have provided in this declaration, including those involving special permissions or permits, appeared in newspapers, and none of those newspapers offered even a hint of a suggestion that the law or laws in question ran afoul of the Second Amendment, the Fourteenth Amendment, or any other provision of the U.S. Constitution.  Nor did these newspapers mention the regulations being repugnant to anything in the relevant state constitutions.  Nor did these newspapers mention any kind of judicial challenge to the firearms carry regulations.  No evidence has yet emerged of a legal challenge to the firearms carry provisions of these municipal ordinances.[66]

36.    Based on the foregoing, I conclude that local laws regulating the carrying of firearms, including laws requiring that those seeking permission to carry

---

[65] *Emporia* [Kansas] *News*, December 19, 1879, p. 5.
[66] Blocher, "Firearms Localism," 144-145.

1  firearms take affirmative measures to be granted such permission, were

2  commonplace during the era of the Fourteenth Amendment.

3       I declare under penalty of perjury that the foregoing is true and correct.

4  Executed on February 20, 2024, at Providence, Rhode Island.

5

6

7                              Michael Vorenberg

# EXHIBIT A

**EXHIBIT A**

**CURRICULUM VITAE**
**Michael Vorenberg**
Associate Professor of History
Brown University

**Education**    Ph.D. in History, Harvard University, November 1995 (American History)
A.M. in History, Harvard University, March 1990 (American History)
A.B. in History, Harvard University, June 1986, *summa cum laude* (Ancient History)

**Professional Appointments**

Associate Professor of History (with tenure), Brown University, 2004-
Vartan Gregorian Assistant Professor, Brown University, 2002-2004
Assistant Professor, History Department, Brown University, 1999-
Assistant Professor, History Department, SUNY at Buffalo, 1996-99
Post-Doctoral Fellow, W.E.B. Du Bois Center, Harvard University, 1995-96
Lecturer, History and Literature Program, Harvard University, 1995-96

**Scholarship**

**Books**
*Lincoln's Peace: The Struggle to End the American Civil War* (forthcoming with Alfred A. Knopf, 2025).
*The Emancipation Proclamation: A Brief History with Documents* (Bedford/St. Martin's, 2010).
*Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*.  Cambridge: Cambridge University Press, 2001. (Paperback edition, 2004.)

**Chapters in Books**
"20 Men, Dead in the Stono," in Brian Matthew Jordan and Jonathan White, eds., *Last Bivouacs: Reflections on the Meaning of Civil War Graves* (Athens: University of Georgia Press, 2023).
"The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88.
"The Thirteenth Amendment," in *1865: America Makes War and Peace* in *Lincoln's Final Year* (Carbondale, Ill.: Southern Illinois University Press, 2015), 7-21.
"Liberté, Égalité, and Lincoln: French Readings of an American President," in Richard Carwardine and Jay Sexton, eds., *The Global Lincoln* (New York: Oxford University Press, 2011), 95-106.

Exhibit A
24

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in
    Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary
    Relevance of the Thirteenth Amendment* (New York: Columbia University Press,
    2010).

"Did Emancipation Create American Citizens?: Abraham Lincoln's View" (in Russian),
    in Victoria Zhuravleva, ed., *Abraham Lincoln: Lessons of History and the
    Contemporary World* (Moscow: Russian State University for the Humanities
    Press, 2010).

"Abraham Lincoln's 'Fellow Citizens'—Before and After Emancipation," in
    William A. Blair and Karen Fisher Younger, eds., *Lincoln's
    Proclamation: Emancipation Reconsidered* (Chapel Hill: University of
    North Carolina Press, 2009), 151-169.

"The Thirteenth Amendment Enacted," in Harold Holzer and Sara Vaughn
    Gabbard, eds., *Lincoln and Freedom: Slavery, Emancipation, and
    The  Thirteenth Amendment* (Carbondale, Ill.: Southern Illinois
    University Press, 2007).

"After Emancipation: Abraham Lincoln's Black Dream," in John Y. Simon,
    Harold Holzer, and Dawn Vogel, eds., *Lincoln Revisited* (New York:
    Fordham University Press, 2007)

"Slavery Reparations in Theory and Practice: Lincoln's Approach," in Brian
    Dirck, ed., *Lincoln Emancipated: The President and the Politics of Race*
    (DeKalb: Northern Illinois Univ. Press, 2007).

"Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed.,
    *Reconstructions: New Directions in the History of Postbellum America*
    (New York: Oxford University Press, 2006).

"The World Will Forever Applaud: Emancipation," in Aaron Sheehan-Dean, ed.,
    *The Struggle for a Vast Future: The American Civil War* (Oxford, UK:
    Osprey, 2006).

"Emancipating the Constitution: Francis Lieber and the Theory of Amendment,"
    in Charles R. Mack and Henry H. Lesesne, eds., *Francis Lieber and the
    Culture of the Mind* (Columbia: Univ. of South Carolina Press, 2005).

"The Chase Court (1864-1873): Cautious Reconstruction," in Christopher
    Tomlins, ed., *The United States Supreme Court: ThePursuit of Justice*
    (Boston: Houghton Mifflin, 2005).

"Bringing the Constitution Back In: Amendment, Innovation, and Popular
    Democracy during the Civil War Era," in Meg Jacobs, William Novak,
    and Julian Zelizer, eds., *The Democratic Experiment: The Promise of
    American Political History* (Princeton: Princeton University Press, 2003).

 "The King's Cure: Abraham Lincoln and the End of Slavery," in Charles
    Hubbard, ed., *Lincoln Reshapes the Presidency* (Mercer, Penn.: Mercer
    Univ. Press, 2004).

"Rutherford B. Hayes," in Alan Brinkley and Davis Dyer, eds., *TheReader's
    Companion to the American Presidency*.  Boston: Houghton Mifflin,
    2000.

Exhibit A
25

"Abraham Lincoln and the Politics of Black Colonization," in Thomas F. Schwartz, ed., *"For a Vast Future Also": Essays from the Journal of the Abraham Lincoln Association*.  New York: Fordham University Press, 1999. (Reprint of article listed below.)

### Refereed Journal Articles

"Spielberg's *Lincoln*: The Great Emancipator Returns," *Journal of the Civil War Era*, 3 (December 2013), 549-72.

"Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (December 2005), 416-26.

"'The Deformed Child': Slavery and the Election of 1864." *Civil War History*, 47 (September 2001), 240-257.

"Abraham Lincoln and the Politics of Black Colonization." *Journal of the Abraham Lincoln Association*, 14 (Summer 1993): 23-46.

### Non-Refereed Journal Articles

Review of Cynthia Nicoletti, *Secession on Trial: The Treason Prosecution of Jefferson Davis*, in *American Historical Review*, 124 (June 2019), 1075-76.

"Emancipation—Then What?," *New York Times*, "Disunion" Blog, January 15, 2013, http://opinionator.blogs.nytimes.com/2013/01/15/emancipation-then-what/?_php=true&_type=blogs&_r=0

"Hearts of Blackness: Reconsidering the Abolitionists—Again," *Reviews in American History*, 32 (March 2004), 33-40.

"The Battle Over Gettysburg: What Lincoln Would Have Said about September 11, 2001." *Brown Alumni Magazine*, 103 (Jan./Feb. 2003), 27.

"Recovered Memory of the Civil War," *Reviews in American History*, 29 (Dec. 2001), 550-58.

### Invited Lectures

"What is an American?: Abraham Lincoln's Answer," Langston Lincoln Lecture, March 29, 2022, York University.

"A Righteous Peace: Abraham Lincoln, the Civil War, and the End of Slavery," The Humanities Forum, Providence College, Oct. 18, 2019.

"How Wars End--or Don't: The Civil War as a Case Study," Henry E. Huntington Society of Fellows Lecture, May 8, 2019.

"Lincoln's Peace: The Struggle to End the American Civil War," Occidental College (Billington Lecture), Feb. 21, 2019.

"The Fate of Slavery after Emancipation," The Great Lectures Series (as OAH Distinguished Lecturer), New York City, October 14, 2017.

"Abraham Lincoln, the Thirteenth Amendment, and the Struggle for American Peace and Freedom," University of Saint Mary Annual Lincoln Lecture, Topeka, Kansas, February 20, 2017.

"The 14th Amendment as an Act of War," Boston College, Clough Center, Newton, Massachusetts, September 20, 2016.

"Born in the USA—So What?" Worcester Polytechnic Institute, Constitution Day
University Speaker, Worcester, Massachusetts, September 19, 2016.

"The Slave Power on the Gallows: The Deeper Meaning of the Execution of Henry Wirz,
Confederate Commandant," University of California, Berkeley, Legal History
Workshop, March 29, 2016.

Salmon P. Chase Symposium on the Thirteenth Amendment (participant), Georgetown
Law Center, Dec. 4-5, 2015, Washington, DC.

"The Last Surrender: Looking for the End of the Civil War," presented at The Lincoln
Forum, Gettysburg, Pennsylvania, November 17, 2015.

"Voting Rights and the Meaning of Freedom: The View from the Civil War Era," Annual
Lincoln Legacy Lecture, University of Illinois at Springfield, October 15, 2015.

"Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth
Amendment," Roger Williams University, October 6, 2015.

"Lincoln and the Jews, Freedom and Discrimination," Brown Hillel Alumni Association,
New York City, May 17, 2015.

"When Should History Say That Slavery Ended in the United States?," Center for Slavery
and Justice, Brown University, May 8th, 2015.

"Lincoln, the Constitution, and the Civil War," Community College of Rhode Island,
April 29, 2015.

"Judgment at Washington: Henry Wirz, Lew Wallace, and the End of the Civil War,"
Annual Symposium of Capitol Historical Society, Washington, DC, May 2, 2014.

"Emancipation, Lincoln, and the Thirteenth Amendment," Dole Forum, Dole Institute of
Politics, University of Kansas, Lawrence, Kansas, November 21, 2013.

"Spielberg's Lincoln and the Relation between Film and History," Department of
History, Loyola University, Chicago, Illinois, November 13, 2013.

"The Appomattox Effect: Struggling to Find the End of the American Civil War,"
Newberry Library Colloquium, Chicago, Illinois, November 6, 2013.

"Reconstruction and the Origins of Civil Rights," National Endowment for the
Humanities Summer Institute on Civil Rights History, Harvard University,
Cambridge, Massachusetts, July 1, 2013.

"The Origins and Process of Emancipation," Emancipation at 150 Symposium, Boston
College Clough Center, Newton, Massachusetts, April 23, 2013.

"Emancipation—Then What?  Citizenship?"  Emancipation Proclamation Symposium,
University of Michigan, October 26, 2012.

"Blood, Allegiance, Belief: The Meanings of Citizenship in the Civil War Era,"
University of Michigan Law School, January 31, 2012.

"American by War: The People and Their Nations during the Civil War," Phillips
Andover Academy, Andover, MA, Nov. 17, 2011.

"Birthright and the Myth of Liberal Citizenship," JANUS Forum, Brown University,
Nov. 15, 2011.

 "American by War: The People and Their Nations during the Civil War," Western
Kentucky University, Bowling Green, KY, Oct. 12, 2011.

"The Elections of 1860 and 2010 and the Politics of Citizenship," Colby College
Symposium on the American Civil War Sesquicentennial, Waterville, Maine,
November 10, 2010.

Exhibit A
27

"Americans Debate Citizenship—Then and Now," Brown Club of England, October 12, 2010, London.

"War Powers, *Ex Parte Merryman*, and the Relevance of the American Civil War," American Bar Association Workshop for High School Teachers, Washington, D.C., June 19, 2010

"Originalism and the Meanings of Freedom," Georgetown Law School, Washington, D.C., March 30, 2010.

"Abraham Lincoln, Politician," Rotary Club of Rhode Island, Warwick, R.I., November 6, 2008.

"Lincoln the Citizen," Abraham Lincoln Symposium, National Archives, Washington, D.C., September 20, 2008.

"Emancipation and its Meaning in Current Scholarship," National Endowment for the Humanities Summer Institute on "Slavery and Emancipation," Philadelphia, Pennsylvania, July 28, 2008.

"Lincoln the Citizen–Or Lincoln the Anti-Citizen?," Abraham Lincoln Symposium, Springfield, Illinois, February 12, 2008.

"The Tangled History of Civil Rights and Citizenship in the Civil War Era," University of Virginia School of Law, November 2007.

"Civil Liberties and Civil Rights: The Civil War Era," American Bar Association, Chicago, May 2006.

"Race, the Supreme Court, and the Retreat from Reconstruction," Boston College School of Law, April 2007.

"Forever Free: The Meanings of Emancipation in Lincoln's Time and Ours," St. Louis University, December 7, 2006.

"Slavery Reparations in Historical Context," Connecticut College, New London, Connecticut, March 2, 2006.

"Abraham Lincoln, The Civil War and the Conflicting Legacies of Emancipation," presented as part of the "Forever Free" series, Providence Public Library, Providence, R.I., January 26, 2006.

"Abraham Lincoln, War Powers, and the Impact of the Civil War on the U.S. Constitution," presented at symposium on "War Powers and the Constitution," Dickinson College, Dickinson, Penn., October 3, 2005.

"Reconsidering Law, the Constitution, and Citizenship," presented at "New Directions in Reconstruction" symposium, Beaufort, S.C., April 15-18, 2004.

"Abraham Lincoln, Slavery, and Modern Legacies," Public History Series, University of Las Vegas, Nevada, February 12, 2004.

"Oaths, African Americans, and Citizenship," University of Nevada at Las Vegas Law School, February 12, 2004.

"Reconsidering the Era of the Oath: African Americans Before Union Military Courts during the American Civil War," presented to the Law and History symposium, Northwestern University Law School, Chicago, Ill., November 3, 2003.

"Racial and Written Constitutions in Nineteenth-Century America," presented to the workshop of the Department of History, Boston College, Newton, Massachusetts, March 2003.

Exhibit A
28

"Abraham Lincoln, Abolition, and the Impact of the Civil War on the Cult of the Constitution," presented at the Social Law Library, Suffolk University, Boston, Massachusetts, February 2002.

 "Francis Lieber, Constitutional Amendments, and the Problem of Citizenship," presented at The Francis Lieber Symposium, University of South Carolina, Columbia, S.C., November 2001.

"How Black Freedom Changed the Constitution," presented at the "Writing the Civil War" symposium, Atlanta History Center, Atlanta, Georgia, September 2001.

"From a Covenant with Death to a Covenant with Life: The Constitution's Transformation during the American Civil War," presented as the Annual Constitutional Anniversary Lecture, National Archives, Washington, D.C., September 2001.

"New Perspectives on Abraham Lincoln, Emancipation, and the Civil War," presented to the Civil War Round Table of Rhode Island, Cranston, Rhode Island, June 2001.

"Historical Roots of the Modern Civil Rights Movement: The Constitution," presented at the Civil Rights Summer Institute, Harvard University, Cambridge, Massachusetts, June 2001.

"Race, Law, and the Invention of the State Action Doctrine in the Late Nineteenth Century," presented at the Columbia University Law School, New York City, April 2001.

"A King's Cure, a King's Style: Lincoln, Leadership, and the Thirteenth Amendment," presented at the "Abraham Lincoln and the Legacy of the Presidency" conference, Lincoln Memorial University, Harrogate, Tennessee, April 2001.

"The Tangled Tale of Civil War Emancipation," presented at the University of Richmond, Richmond, Virginia, March 2001.

"The King's Cure: Abraham Lincoln, the Thirteenth Amendment, and the Fate of Slavery," presented at the Abraham Lincoln Institute of the Mid-Atlantic, Washington, D.C., March 2001.

"Race, the Supreme Court, and the Retreat from Reconstruction," presented at the Boston College School of Law, Newton, Mass., April 2000.

**Papers Read or Discussed**
"The *Bruen* Stutter-Step: 1791, 1868, and the (Temporarily) Open Question of When a Right Comes to Mean What it Means," *Journal of American Constitutional History* conference, University of Wisconsin Law School, Sept. 30, 2023.

"Prisoners of Freedom, Prisoners of War: An Untold Story of Black Incarceration--And How it Might be Told," Brown Legal History Workshop, Oct. 28, 2019.

"Bearer of a Cup of Mercy: Lew Wallace's American Empire," Henry E. Huntington Library, Research Fellows Meeting, Feb. 6, 2019.

"Anti-Imperialism and the Elusive End of the American Civil War," presented at the "Remaking North American Sovereignty" Conference, Banff, Alberta, Canada, July 31, 2015.

"The Election of 1864: Emancipation Promised, Emancipation Deferred," presented at The Annual Meeting of the Organization of American Historians, Atlanta, Georgia, April 11, 2014.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Department of History, Northwestern University, Evanston, Ill., Nov. 15, 2013.

"Birth, Blood, and Belief: Allegiance and the American Civil War," presented at the Elizabeth Clark Legal History Workshop Series, Boston University School of Law, Nov. 16, 2011.

"French Readings of Lincoln's Role in the Creation of American Citizenship," presented at the conference on European Readings of Abraham Lincoln, His Times and Legacy, American University of Paris, Paris, France, October 18, 2009.

"Was Lincoln's Constitution Color-Blind?," presented at the Abraham Lincoln Bicentennial Symposium, Harvard University, Cambridge, Mass., April 24, 2009.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," presented at conference on Slavery, Abolition, and Human Rights: Interdisciplinary Perspectives on the Thirteenth Amendment, April 17, 2009

"Did Emancipation Create American Citizens?—Abraham Lincoln's View," presented at the conference on Abraham Lincoln: Issues of Democracy and Unity, Russian State University, Moscow, Feb. 8, 2009.

"The Racial and Written Constitutions of Nineteenth-Century America," Cogut Center for the Humanities, Brown University, Nov. 4, 2008.

"Civil War Era State-Building: The Human Cost," Boston University Political History Workshop, March 19, 2008.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," annual meeting of the *Law and Society Association*, Montreal, May 30, 2008.

"Claiming Citizenship: Black and White Southerners Make Their Cases During the Civil War," presented at the annual meeting of the *Southern Historical Association*, Memphis, November 2004.

"Imagining a Different Reconstruction Constitution," presented at the annual meeting of the Social Science History Association, Baltimore, November 2003.

"West of Reconstruction: Resolving Mexican-American Property and Citizenship in the Civil War Era," presented at the annual meeting of the *American Historical Association*, San Francisco, California, January 2002.

"The Limits of Free Soil: The Resolution of Mexican Land Claims during the American Civil War," presented at the annual meeting of the *Organization of American Historians*, St. Louis, Missouri, April 2000.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Nineteenth-Century America," presented at the annual meeting of the *American Society for Legal History*, Toronto, Ontario, October 1999.

"Law, Politics, and the Making of California Free Soil during the American Civil
War," presented at the annual meeting of the *Western History Association*,
Portland, Oregon, October 1999.

"Land Law in the Era of Free Soil: The Case of New Almaden," *American Society
for Environmental History*, Tucson, Arizona, April 1999.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in
Antebellum America," presented at the annual meeting of the *Society for
Historians of the Early American Republic*, Harpers Ferry, W.V., July 1998.

"The Constitution in African-American Culture: Freedom Celebrations and the
Thirteenth Amendment," presented to the *W.E.B. Du Bois Institute*,
Harvard University, Cambridge, Massachusetts, April 1996.

"Civil War Emancipation and the Sources of Constitutional Freedom," presented
at the annual meeting of the *Organization of American Historians*,
Washington, D.C., April 1995.

"The Origins and Original Meanings of the Thirteenth Amendment," presented at
the annual meeting of the *American Society for Legal History*,
Washington, D.C., October 1994.

"Civil War Emancipation in Theory and Practice: Debates on Slavery and Race in
the Border States, 1862-1865," presented at the *Southern Labor Studies
Conference*, Birmingham, Alabama, October 1993.

## Service

### University

Anna S. K. Brown Collection Committee of Management, member, 2016-present.

Co-Organizer (with Faiz Ahmed, Rebecca Nedostup, Emily Owens), Brown Legal
History Workshop, 2015-present.

Political Theory Project, Advisory Board, 2010-2019

Organizer and Presenter, "Abraham Lincoln for the 21st Century: A Symposium honoring
the Abraham Lincoln Bicentennial," John Hay Library, Brown University,
Feb. 27-28, 2009.  Plenary lecture by Benjamin Jealous, president of NAACP,
and six symposium participants.  Funding secured from Rhode Island Foundation,
Rhode Island Lincoln Bicentennial Commission, Brown Provost, Brown Dean of
Faculty, History Department, Africana Studies Department

### Profession

Board of Editors, *Journal of Constitutional History*, 2022-present.

Program Committee, Society of Civil War Historians, 2022 annual conference,
2020-present.

Cromwell Prize Committee, American Society for Legal Historians, 2014-2017.

Board of Editors, *Law and History Review*, 2004-2013 (reappointed 2009).

Advisory Committee, United States Abraham Lincoln Bicentennial Commission,
2002-10.

Board of Advisors, Lincoln Prize, Gettysburg Institute (2000-present).

Co-Chair, Local Arrangements Committee, Annual Meeting of the Society for
Historians of the Early American Republic, Providence, Rhode Island,
Summer 2004.

Referee for the National Endowment for the Humanities. 2001-2003.

Committee Member, Local Arrangements Committee, Annual Meeting of the American Society for Environmental History, to be held in Providence, Rhode Island, Spring 2003.

Referee for article manuscripts submitted to the *Journal of American History*, *Law and History Review*, *Law and Social Inquiry*, *Journal of the Civil War Era*, and *Civil War History*.

Referee for book manuscripts submitted to Houghton Mifflin, Harvard University Press, Oxford University Press, New York University Press, University of Chicago Press, University of Illinois Press, and University of North Carolina Press.

Advisory Editor for *Proteus* (special issue devoted to the American Civil War, Fall 2000).

### Community

Lecture on American Citizenship and Exclusion, Center for Reconciliation, Providence, R.I., July 2018.

Instructor in co-taught course at the Rhode Island Adult Correctional Institute (ACI) through the Brown University BELLS program, 2013.

Lecture on Reconstruction-Era Constitutional Amendments, Barrington, RI, Open Classroom, April 4, 2013.

Lecture on 150th Anniversary of the Emancipation Proclamation, Wheeler School, Providence, Rhode Island, January 17, 2013.

Rhode Island Civil War Sesquicentennial Commission, 2011- .

Rhode Island Abraham Lincoln Bicentennial Commission (appointed by Governor), 2005-2009.

Lecturer on the Brown Steering Committee on Slavery and Justice, The Wheeler School, Providence, Rhode Island, November 2006.

Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., April 2006.

Seminar leader for National Endowment for the Humanities "Teaching American History" initiative at Rhode Island Historical Society, Providence, R.I., September 2005.

Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., March 2005.

Advisor to the Burrillville, Rhode Island, School Department, on securing and administering a "Teaching American History" grant from the United States Department of Education, 2001-2002.

## Academic Honors and Fellowships

Ray Allen Billington Professor, Occidental College/Henry E. Huntington Library, 2018-19.

Pembroke Center for the Study of Women and Gender Fellowship, Brown University, 2016-17.

National Endowment for the Humanities Long-Term Fellowship, Massachusetts Historical Society, Boston, Massachusetts, 2014.

National Endowment for the Humanities Long-Term Fellowship, Newberry Library, Chicago, Illinois, 2013.

Finalist, CIES Fulbright Fellowship for University of Rome III (2010-11 competition)
Cogut Center for the Humanities Fellowship, Brown University, Fall 2008.
William McLoughlin Prize for Teaching in the Social Sciences, Brown University, 2007.
Karen Romer Prize for Undergraduate Advising, Brown University, 2007.
History News Network (HNN) "Top Young Historian," 2005 (1 of 12 named in the U.S.).
Vartan Gregorian Assistant Professorship, Brown University, 2002-2004.
Finalist, Lincoln Prize, 2002 (for *Final Freedom*).
American Council of Learned Societies/Andrew W. Mellon Fellowship, 2002-03.
Kate B. and Hall J. Peterson Fellowship, American Antiquarian Society, 2002-03.
Salomon Research Award, Brown University, 2002-2003.
National Endowment for the Humanities Summer Stipend, 2001.
Julian Park Fund Fellowship, SUNY at Buffalo, 1998.
Research Development Fund Fellowship, SUNY at Buffalo, 1997.
Harold K. Gross Prize for Best Dissertation at Harvard in History, 1996.
Delancey Jay Prize for Best Dissertation at Harvard on Human Liberties, 1996.
W.E.B. Du Bois Fellowship, Harvard University, 1995.
Whiting Fellowship in the Humanities, 1994.
Bowdoin Prize for Best Essay at Harvard in the Humanities, 1993.
Indiana Historical Society Graduate Fellowship, 1993.
W. M. Keck Fellowship, Henry E. Huntington Library, 1993.
Everett M. Dirksen Congressional Research Fellowship, 1993.
Mark DeWolfe Howe Fellowship, Harvard Law School, 1993.
Charles Warren Center Research Fellowship, Harvard History Dept., 1991-2.
Derek Bok Award for Distinction in Teaching at Harvard, 1991.
Philip Washburn Prize for Best Senior Thesis at Harvard in History, 1986.

Exhibit A
33